and U.S. v. Julio Marquez Alejandro, and it's my understanding that Attorney Prado-Galarza is joining us via Zoom. The Court granted a request for that. Good morning. Good morning, Your Honor. Attorney... Joshua Dreitel, Your Honor, for Mr. Blondet. Yes. And co-counsel is Louis Freeman. We tried the case together, but he had surgery recently, so he was unable to attend today. Yes. We received your letter that you were filling in for him. Thank you, Your Honor. Thank you. The first four points of our brief are very much interrelated, and so I'd like to approach them holistically because of the impact of the dismissal of the Martinez murder on all of those points and the case itself. So even if, notwithstanding whether the district court was correct in its initial decisions, reevaluating them in the light of the absence of the Martinez murder... Was the Martinez murder... Was anyone ever tried in any court for that murder? No. This is the only... Alleged murder. Alleged, yes. Yes. But the... So the pre-Enterprise murders, the pre-La Ono murders, the government's rationale and the court's rationale for introducing them had to do with explaining why Blondette was not punished, even killed, as a result of the Martinez murder. You take out the Martinez murder, you take out the rationale with respect to Blondette. Wait, wait, wait. I'm not so sure it was that narrow. As I understood it from reading Judge Furman's opinion, he allowed the murders to come in, the pre-La Ono murders, for background, show how the parties knew each other, their relationship, the creation of La Ono, for a number of things. And he went through a decision of where he was going to allow it as to Mr., you know, as to primary defendant Alejandro, Julio Marquez Alejandro, and also as to your client, Mr. Blondette. And it's my understanding of the seven pre-creation La Ono murders, your client was involved, or at least the testimony from cooperating witnesses, was he was involved in four of them. Two double homicides, yes, Your Honor. All right. So it's not as if the Ramirez murder was the only murder that came in to explain the relationship in the background. You're not suggesting that, are you? No, no. The Martinez murder was charged. It's a predicate act. Right. So — No, but the problem with the pre-La Ono murders is the predominant rationale that the Court described in Judge Furman's opinion is all about Mr. Alejandro. It's his relationships with those assassins who he then uses for the other murders charged in the indictment, the Crespo-Cotto murders, the Barbosa murders. Blondette has nothing to do with those. But if you — And also, we said we wouldn't — Counsel, I thought in his decision, Judge Furman said, even if you were tried separately, those would come in for the same purpose that they came in for Mr. Alejandro. Did I misread the record? But only for the purpose of establishing that Mr. Blondette was not punished for the Martinez murder because he had performed these other acts before the enterprise existed, and that his loyalty was rewarded with a lack of punishment as a result. Also, I just think that it's not background. It's opposition. It's not background. It doesn't complete the story. Every cooperator testified about relationships within the context of the enterprise. The government, in its own brief, says they put in all this material during the enterprise, that it was sufficient for them. And also, Mr. Blondette had pleaded guilty to dealing drugs. This was not necessary for anything to have to do with the case if you take Martinez out. Did you raise your retroactive misjoinder argument to the district court? No, because the last thing that happened was the Rule 29. Right. But did you move for a new trial on Act I under Rule 33? No, we did not, Your Honor. So is it kind of your position that district courts should sui sponte, reopen things, having granted the Rule 29 on Count I? Well, I don't think there's any case in this court, and we looked for it, and the government doesn't cite any case that says that the retroactive misjoinder issue has to be brought back to the district court for determination. This is an issue on appeal based on the current state of the case. But without a Rule 33 motion, I mean, if you had made a Rule 33 motion timely, then the district court could have considered it. And, you know, now we're in a position of a long time has passed, and you're asking, you're making this argument that there was a retroactive misjoinder after the district court dismissed the Martinez murder.  So, you know, Rule 33 says that the district court can't, in fact, do it sui sponte, and that the counsel needs to raise the misjoinder in a Rule 33 motion. There's no law that says that, Your Honor. There's no case. It says that the court can't do it. No, but that's a — we're not obligated to make a Rule 33 motion. All of the retroactive misjoinder cases are on appeal. They're all appellate cases in this court where, in the context of the current record, because of the subsequent dismissal of a count or a finding of insufficiency in some respect, that that puts the case in a totally different posture. Why isn't there an obligation to raise it at a point when that can be assessed on the full record the district court has just heard that? It's the same record that this court has. There's no distinction. And so there's no — we didn't have the obligation to make a, you know — You're just saying it's an ordinary appellate argument. Yeah. Just error by the district court. Yes. Are you willing to concede that it's reviewed on plain error? No. You're not even willing to concede that? No. And even if it was plain error, it clearly goes to substantial rights. It's clearly an error. We think that it meets that standard, but we don't think that standard applies. And the government cannot cite a single case that says plain error applies in this context. It's a question of evidence, counsel, even if, you know, Judge Furman let the two counts go to the jury relating to the murder of Ms. Ramirez, and the jury convicted your client of those, and then he later looks at the elements of the offense and says, look, you have to show that not that the murder was sort of part and parcel of the overall activities of the organization, but that it was actually done for the purpose of advancing something very direct in an objective of the organization. And I get the argument that this was a reaction on the moment at the Judge Furman made a point of saying, look, at the time of the murder, it wasn't, you know, to facilitate a drug deal, or it was on the spot sort of a reactive murder. That said, however, let's assume counts two and three were not in the superseding indictment. How is the evidence of that murder not relevant overall, not to advance a purpose of the organization, but relevant to sort of how Mr. Blondett conducted himself, his role in the organization? It's not related to the organization. That's the whole point. If it's not related to the organization, it's not admissible. It's not part of the enterprise. It's not part of the RICO. It's not admissible. It's unbelievably prejudicial. It could not be more prejudicial. Well, Judge Furman commented on that, and he said, given the evidence that your client was involved in four double homicides pre-creation of La Uno, and all the evidence the jury heard of all the murders done for the purpose of the organization, furthering the business of the organization, and a statement your client made that he had murdered 32 people as part of his role or something like that, how is that not then, how is this additional murder that much more inflammatory to make it prejudicial? So without, so the four La Uno murders, pre-La Uno murders, should come out for the reasons that we've stated, because they're in, for the Martinez murder. So you take out the Martinez murder. You take out the Jesus murder, as Judge Furman found. And we're taking out the Martinez murder, even though there was substantial evidence also about why he wasn't punished for it. It tended to show his embeddedness in the enterprise. It's only relevant because of the murder. If you don't have the murder, the rest of it's irrelevant. There was plenty of evidence that said he was MAPA, he was close to Alejandro, he was dealing drugs. He pled guilty to that before this indictment. Well, he pled guilty to sale of five kilos of cocaine. He didn't plead guilty to being a member of La Uno and engaging in racketeering activity. That's what he opted to go to trial on. No, no, but the point is that the, that predicate act is already done. That came in. His guilty plea came in as the predicate act of drug dealing. But the indictment alleged more than one, the indictment alleged, counsel, this works better if you let me finish my question, okay? And then maybe your answer will be easier for me to get. So let me just finish the question. The indictment alleged more than one type of predicate act. It alleged drug dealing, murders, and other violent acts. So it may be that he pled to one, which was the five kilos, but the government isn't precluded from introducing evidence that he participated in the other alleged racketeering acts. That gets the constructive amendment argument. This gets to Montague, which this Court was, which the Supreme Court remanded to this Court a charge with predicate acts that does not articulate with specificity the facts of those predicate acts in the indictment is invalid. We move to that before the trial. It's part of our brief here. Whether the RICO statute is unconstitutional is applied here. Whether appellants should be revisited or whether it's a constructive amendment, that addresses that issue. But I want to go back to Judge Carney's question with respect to what the case looked like without Martinez. So there's no Laono murders. There's no pre-Laono murders. There's no de Jesus murder, because Judge Furman found that there was not even a preponderance for that. You have one conversation by a cooperating witness who's working off 20 murders of his own through his testimony. He claims that there was a conversation that he's reciting from 17 years earlier, or 15 years earlier, in which Mr. Alejandro proposes a murder at a group conversation, and Mr. Blondet agrees to contribute some money to pay the assassin. That's it. That's the violence that Mr. Blondet is accused of when you look at the facts and you take – look, the government began its opening with the – Your argument, I understand – I think I understand your argument that if you take out the Ramirez murder, there's no evidence against your client. But we also would have to take out the pre-Laono murders and all the other evidence of all the other murders that were done during the operative period of the alleged racketeering activity, correct? I mean, we'd have to say Judge Furman – let me just finish for a second. Well, yes, let me finish. Judge Furman also erred in allowing the pre-Laono murders as to your client, either in a joint or a separate trial, correct? Well, the Laono murders did not come in as part of the enterprise. They could not have convicted on the basis of the Laono murders. They were simply prejudicial, and they should not have come in because there was no proper purpose for them with respect to Blondet. We offered not to cross-examine those witnesses. I understand that's your argument. So what I'm saying is they couldn't have convicted on the pre-Laono murders with respect to the other murders. Your Honor, if I may answer, you asked a question. I'm trying to answer it comprehensively. Counsel, counsel. Okay. My question is very simple. Is your argument based on no evidence other than this one conversation against your client? In order to reach that conclusion, we have to find that both the pre-creation of Laono murders that your client allegedly participated in, that evidence should not have come in, as well as any activity, murders relating to after Laono was created, should not have come in against your client. No, that's not our argument. Our argument is that with respect to the RICO, they're limited to what happens within the enterprise. The pre-Laono murders cannot be the basis for finding him guilty of the RICO. They came in for a different purpose, an improper purpose based on, retrospectively, the elimination of the Martinez murder from the case. With respect to Mr. Blondet, with respect to what our argument is, is that when you look at the evidence against Mr. Blondet within the confines of the enterprise, it is limited to that one conversation. The other murders come in because of the problem of this indictment that doesn't articulate predicate acts. In Montague, this Court specifically said opaque statutory reference to the dissent. I'm sorry. Montague is a CCE case, though, not a RICO case, right? But the way that the dissent in Montague presented it is that a statute with predicate offenses, and this RICO statute is the precise same type of statute. But we're talking about the dissent saying they're the same type. But the dissent was vindicated by the Supreme Court and the Solicitor General. The Solicitor General admitted error. It was remanded to this Court, which then reversed the district court. And then it went back to the district court, and he was resentenced on the original. Again, all in the CCE context, though, right? Yes. But the CCE context requires enumeration of three drug crimes, just like RICO requires two predicate acts. I think there is different lines of case law interpreting the three predicate acts in RICO and CCE. Isn't that right? There is some, but I don't think it's a distinction that holds up. I think that doctrinally, the diversion, the divergence has no principle to it, because the same principles should apply. It's a predicate-oriented statute. You have to articulate the predicates. The free-floating, how do you try a case with 36 murders, you don't have forensics for 30 of them. They're not charged against your client. Your client had nothing to do with them. A guy gets up on the stand, Asensio Viera, and says, I killed this guy, I killed that guy, I killed this guy. And we had nothing to do with any of it. And how do you try? We'll try that case with that conversation about the contributing money. That's a case you can try. The rest of it is completely unfair, and it's a constructive amendment under the Montague principle. So I want to understand also why the Martinez ruling, the Rule 29 ruling, happened because the purpose of the killing was not sufficiently tied to the enterprise. But there was evidence that follow-up activity, protecting your client, was undertaken by members of the enterprise. Why isn't that relevant to his participation and role overall in the enterprise? If I could divide those into two. First of all, so the murder's out. Yeah. So they want to talk about, well, something happened that potentially affected his role in the enterprise. I don't know why that would be relevant to the proof that he's not in the enterprise, that he's going to be kicked out. That's not really what they were trying to prove. The government took the position it was part of the enterprise. That's in the indictment. So it totally cross-purposes to what the government was trying to prove. I think Judge Furman would have kept it out altogether, any mention of that, because it didn't have relevance to the elements of the offense. It's contrary to the elements. And even if it came in, even if, which I don't think it should have, it could have come in in such a sanitized way that it would not have been prejudicial. Like, this is the most prejudicial case. Look, I'm not hiding it. It's terrible. And the jury saw photos and heard testimonies. When did Judge Furman say that he would have kept it out? No, I said my belief is that he would have kept it out, given the principles that apply to evidence. Well, he was the trial judge. He heard the evidence. But he didn't let it go to the jury. And then he, on your motion, under Rule 29, took it away from the jury because he found and issued a written decision why he didn't think that one additional element for the purpose of furthering the organization was met. But I don't understand Judge Furman ever being confronted either with a misjoinder argument or what the implications of this would be. So when you say you're speculating that had this murder been thrown out pre-trial, he wouldn't have allowed any evidence of it. Is that what you're saying then? I think he shouldn't have. I don't think that it would have been proper to put it in. And we moved pre-trial to dismiss the Martinez murder on the very ground it was dismissed after trial. And we had to endure a trial with the most prejudicial evidence possible when the actual admissible evidence against Mr. Blondett on the violence was minuscule. And he got a 50-year sentence as a result. Thank you, counsel. Yes, you're 15 minutes over, but you have reserved your one minute for rebuttal. Thank you. I now will turn to Attorney Prado-Galarza. Good morning, sir. Good morning. Good morning, Your Honors. May I please support Edwin Prado for defendant, I mean for appellant, Julio Marquez Alejandro. Your Honors, this appeal turns on a contradiction the government cannot reconcile. The Southern District of New York prosecution required the government to prove both a continuing enterprise through 2016. And Mr. Marquez Alejandro's continued participation in that enterprise, the record established neither. The evidence from the District Court of Puerto Rico prosecution of the government, including United States v. Ramirez-Rivera, 803rd Circuit, 2015, demonstrate that la ONU was dismantled through coordinated federal enforcement actions. Beginning in March of 2012 and ending by 2014, the alleged founders, leaders, enforcers, territorial operators, and principal drug traffickers have either been arrested, federally indicted, incarcerated, or they were cooperating with the government. And or they were deceased. The government itself destroyed the organization. It later claimed it remained operational in New York. We have to, there's certain, aside from that prosecution, there were several other prosecutions prior to the 2012 case of U.S. v. Ramirez-Rivera. And I invited the court to read that opinion of the first circuit because the common purpose is quite different of the theory of the government of that enterprise to the theory of the government of the version of the ONU New York version. Now, there were several other prosecutions that we need to point out in Puerto Rico that have dismantled la ONU. But counsel, I have, can you hear me? Yes. Thank you. I have a question and that is some of the arguments that you're raising today and in your brief were raised before the jury and the jury returned a verdict of guilty. We typically don't revisit what a jury does. How does that impact your, you know, sufficiency of the argument? Were you asking us to undo what the jury did? Your Honor, there's some structural defects in this case that I haven't gotten to that would include the dismantlement of the organization. We're not asking at this point, while we preserve the issues of sufficiency that we preserve on the, on our briefs, but if you let me explain, the continuity requires that it seems, based on the government's theory, it seems that after the dismantlement of the in fact enterprise, and according to Boyle and the case of Turquette, that association in fact requires a continuing unit that functions with a common purpose. And the problem is that by the time the dismantlement happened of the ONU, our client was in prison. Well, the fact that someone's incarcerated doesn't mean, as we've seen all too often, that they are removed from the enterprise entirely or that they're factually or legally incapable of participating through conversations with other people, of directing actions to be taken. And, you know, they are not incommunicado. They're not in solitary and cut off from the world. But in this case, Your Honor, Congress specifically established on the operational definition of RICO in section 1956, 196215, a clear state that when a person is in prison, the department of racketeering is excluded. Now, the record also, the trial record also establishes that there was no overt act, no predicate act by my client from 2013 on. There was, as a matter of fact, one by this, the witness that testified about the Bronx daycare. Basically, the testimony in court basically said that Blondette had to do with that operation of that daycare kilograms distribution and that our client had nothing to do with it. So I'm looking at the transcript and the appendix on page 903. It says after he's arrested, was Chino still involved in making decisions for MAPA? Yes. After he was arrested, do you remain in contact with him? Yes. What would you talk with Chino about? You know, he sent me a message once telling me you need to go to MAPA. I was already in Florida. And you know, in order to take care of the crack spot and to collect money from several people who owed money. To your knowledge, where was Chino at that time when you got that message in jail? How did you get that message? Because he spoke to the person who used to be his wife and she told me. So isn't that some evidence that he continued to be involved after he was arrested and in jail? Well, Your Honor, and I'm glad you mentioned this because that's a different organization. That's not La ONU. MAPA was a, MAPA was a, has been subject of a prosecution in Puerto Rico in the United States versus Carmona Serrano, number 23, criminals 238 in the District of Puerto Rico. The government cannot characterize MAPA as a drug trafficking organization at the same time in Puerto Rico without RICO and in New York claiming that MAPA is a RICO enterprise. Those two legal theories are incompatible. Sir, why are they incompatible? I thought La ONU grew out of an agreement with MAPA and another organization to divide up territory and to work together. If you, if you, and that's why I'm asking the court to read the opinion on the First Circuit, because MAPA was a, if you read on the- Wait a second. The opinion of the First Circuit, you know, that's a different trial and different evidence and a different proceeding. You know, I'm not aware that we're bound by factual findings on a different evidentiary record in a different prosecution, are we? No, Your Honor, this is, the record, the MAPA, the court of appeals in that case made a record of all the judicial records and MAPA, the Manuela Perez organization, was not included in the ONU. And that's why I am convinced that the ONU was dismantled and this other organization that they claim assisted was a different organization without- Of course, we look at, we look at the record made in this case, sir, right? And, and so we're looking at the record that was made during this trial and these prosecutions. And it looks like the government showed that they were, that MAPA was related to La ONU. And that's the, that's what the jury found. And so that where we defer to the jury's findings, absent some clear error that you can demonstrate. After La ONU was dismantled, any, any other organization after that, requires continuity. And there was no continuity. With respect to La ONU, there were different traffic organizations created after La ONU that did not involve my client. Now, even if we can, even if the government can establish continuity of La ONU after its dismantlement, there is no evidence that all clients with respect to La ONU had any relationship with respect to La ONU. Not to MAPA, because again, based on the record that we have in, of all the prosecutions in Puerto Rico, MAPA is a distinct situation. Now, the, what the government proved was succession and replacement, not continuity of La ONU. MAPA is a different organization with different structures, different leadership, different timelines, different prosecutions. And now, now we can turn into whether that MAPA, that La ONU continuity involved my client. Again, section 19, 19, 1961-5, that defines RICO, requires at least two acts of connectivity, the last of which occurred within 10 years. And then Congress, on a parenthetical, says excluding any period of imprisonment after the commission of a prior act. The exclusion is not interpretative. It's not judicial inference. It's Congress express command in the operative definitional section of RICO itself. Mr. Marquez Alejandro was arrested on May 22, 2013, and has remained continuously incarcerated since that date. The government nevertheless relied on post-2013 conduct to extend the conspiracy through 2016. The statute forbids it. And, and. Counsel, I, I just want to tell you that you are running over time. So if you can get to wrapping up your argument. Yes, I will. I will wrap up my argument. Thank you, Your Honors. The government prosecuted a dismantled enterprise, relied on continuity theories contradicted by its own prosecution in Puerto Rico, attributed to post-2013 conduct to an incarcerated defendant, and conflated with unrelated organization to a fictional Southern District of New York RICO enterprise, unsupported by overt acts, continuity, or constitutional venue. The record proves succession, not continuity. Replacement, not persistent. Historical association, not ongoing participation. For those reasons, the conviction must be vacated and indictment dismissed. Thank you, Your Honors. Thank you. Thank you, Attorney Prado-Lagarza, and, Galarza, I'm sorry. Counsel, Attorney Davis. Thank you, Your Honor, and may it please the Court. My name is Peter Davis. I'm an Assistant United States Attorney in the Southern District of New York. I represent the United States on this appeal, and I also represented the United States in the proceedings below. I'd like to start by making three points about the pre-law ONU murders. I'd like to address their probative value because I believe my colleague in opposition has taken an overly narrow view of the purpose they were admitted at trial. I'd like to address Judge Furman's exacting discretion in admitting that testimony. And then, finally, I'd like to set up the balancing test in the correct way for the Court. So, starting with— And when you're saying the purpose, just for clarification, is as to both Mr. Blondette and Mr. Alejandro, or are you focusing on only one? Your Honor— They both raise the same issue, but I want to be clear what you're addressing. The purposes I'm about to address, Your Honor, apply equally to both defendants and Judge Furman held as much. And specifically, these murders and the limited testimony provided key background information about the formation of LIONO. And why that's important is because the enterprise at issue was remarkable. What that enterprise was, was a centralized decision-making body that decided basically all acts of violence and drug dealing in Puerto Rico. For the jury to properly understand how that organization came to be, they were entitled to hear the background and those murderers and the way that they led to its formation. And then, I'd like to turn, if I could, just to Judge Furman's discretion and how he admitted this evidence. Judge Furman was exacting in allowing us to admit only very limited portions about these pre-LIONO murders. At the time that testimony was given, Judge Furman gave a limiting instruction, explaining to the jury exactly how they could use the information and exactly how they couldn't. Then, at the final charge, Judge Furman again gave an instruction, exactly how the jury was supposed to interpret that information and how they weren't. And what you're seeing there is a district judge doing exactly what this Court's holdings direct him to do, which is make discrete calls on evidence, explain to the jury what they're supposed to do with it, and limit any impact of it. And then finally, Judge, I just want to make sure we're thinking about the balancing in the right way. Here, the balancing test is the evidence and the pre-LIONO murders versus all of the evidence admissible on count one. That means the swaths of evidence admissible against the enterprise, all of the murderers, all of the drug dealing, all of the bribery. And when you look at the 404B murderers, the pre-LIONO murderers, against that evidence, you really see the overwhelming nature of evidence. And we have case law that says that racketeering acts of, well, co-conspirators, because it's a conspiracy, it's an organization, that acts of others can be admitted to prove the guilt of the non-acting party. Correct? That's exactly right, Your Honor. The defendants were charged in count one with a racketeering conspiracy. The crime there is the agreement. And the way we're allowed to prove that agreement is through the acts and racketeering activity of the entire organization. And that's exactly what happened at trial. If I could, Judge, I'd like to now move on to the Crystal Martinez murder. I'd like to make a couple of points here, two gating points that the Court focused on, and then I want to address the substance. The two gating points were, first, we're here on plain error. Gating issues, a threshold issue before we address the merits of that claim. And those gating issues are the standard of review, and then this assumption that this argument rests on. The standard of review here for the Court is plain error. This was not raised below. And that we do cite authorities saying that plain error review is appropriate out of the six. Are you talking about the retroactive misjoinder argument? Yes, Your Honor, on this. This is Mr. Blondette's argument about retroactive misjoinder. And that's important because the plain error review has a component of showing a substantial impact on the defendant's rights. And then the substantive retroactive misjoinder test has a miscarriage of justice requirement as well. So it's really hard to imagine a higher burden for appellant than they have right now. But even setting aside the standard of review, there is a bigger threshold issue, which is the evidence of the Ms. Martinez murder would have been admissible as to count one, even if it was not charged as a standalone crime. And I asked your opponent precisely that question.  Why? How would that evidence of that murder, albeit his argument was it would have been sanitized, perhaps. I don't know. It's not a pre-Laono murder, right? This is a murder that happens during the period of the conspiracy. But why would it have come in if counts two and three were not there? Thank you, Your Honor. The answer lives in the statute that was charged for the standalone crimes versus the statute that's charged for count one. The statute that was charged for the standalone crimes that Judge Furman addressed required the government to prove that the intent of the murder was for the purpose of maintaining or increasing the defendant's position in the enterprise, whereas the count conspiracy is challenging the agreement. And so there's two pathways that this murder and its aftermath would be relevant under 401 as to count one, even if you did not charge it as a standalone crime. Those two pathways are as follows. One, after the murder, and I think Judge Carney identified this, after the murder, Laono meets together, basically has a board meeting, decide what to do with the defendant, and they decide to give him a pass based on his last conduct. It's hard to imagine more devastating enterprise proof than a group of co-conspirators meeting to discuss a senior leader's actions and deciding what to do about it. That's point one. The second, the jury would certainly be able to look at this murder and how it happened, basically the defendant killing an innocent person in front of a crowd and say that person felt emboldened to do that murder by their position in Laono. Specifically, Mr. Blondette was a senior leader of a violent organization that decided so much death in Puerto Rico. Of course he felt emboldened to be able to do what he wanted and to treat this person without any dignity for human life. And so that's another avenue for 401 relevance. So under the first avenue, the murder of Ramirez might have come in in a sanitized way, right? You could envision the court saying, look, you can explain that he's being forgiven and it has to do with murdering a woman because the rules of the organization is you don't murder women and children. But the second one you're saying would allow more of the details of the murder? I think this is a great question because it goes to the district judge's discretion. What you're basically I've identified is a 403 question of where to draw the line about the amount of evidence, not a 401 question about relevance full stop. And my point to the court is, before we get to the retroactive misjoinder test, we need to make sure that there is even a spillover to be worried about. And here there is not, because if some version of the testimony comes in under count one, even if it looks slightly different, because the judge as a trial judge is saying, no, we're going to do this, but not that, then we don't have a spillover problem. So then I want to say... And remind me why exactly we're on plain error here. I mean, if they had sought to sever, because they did seek to sever at the beginning, and the trial, the counts were really lopsided. And so Mr. Blondet had three charges, and two of which he's ultimately acquitted of, not for having not done the act, but having not the enterprise-related purpose. You know, they had raised the essence of prejudicial, prejudice on the jury, I guess, by including them not severing trial and not proceeding separately. So I'm not entirely sure why the kind of Rule 33 arguments I was suggesting earlier are applicable, given the history of the case. What am I misunderstanding? Thank you, Your Honor. May I respond just in two ways? First, I think what's important to know is this is relief that the defendant sought. So the Rule 29 motion was made by the defendant. This was not a surprise ruling from Judge Furman. And the reason I say that is because there's nothing to prevent counsel from arguing in the alternative, if that, then this. And that was totally open to counsel in the Rule 29 context. The second point I'd make is the principles underlying why this court applies plain error when it's not raised below are especially paramount here. The test itself is one that requires a fact-specific analysis, looking about whether something is more inflammatory than other evidence, looking to see if there was a miscarriage of justice, considering the entire trial record. That's incredibly difficult on a cold record, but that's something that trial courts do all the time, especially a judge who presided over the trial and presided over the case. So I think in combination of actually that it was not raised and could have been raised, with a combination of how this court looks at issues on plain error or reasons why plain error applies. But let's say you disagree and the court says, no, we're not looking at plain error and we're looking at this flat. This claim still fails, even if you were to disagree beyond the threshold issue as well. And that's because when you properly set up the test of inflammatory nature, you can see that the amount of evidence on count one was both overwhelming and incredibly violent and horrific. And so there is no problem here because the count one evidence included swaths of murders that were attributable to the enterprise and therefore the defendant. It included bribery of police officers. It included incredible amounts of drug dealing. And so when you look at that combination of overwhelming evidence on count one, this claim fails at all steps. Judge, with my remaining time, I'd like to address one last issue, which is just this as-applied vagueness challenge and this Montague case, which was raised first in reply. Two quick distinctions on that. First, doctrinally, this court, since Montague, has held that Applin's remains good law. That's in the case United States v. Pollock. So just as a matter of doctrine, that argument fails. But even setting aside, we're looking at two different statutes. The statute at issue in Montague was the CCE claim, written in a completely different way than a 1962 D claim, which is what the Supreme Court has said in Salinas, applied in Applin's, and thereafter. Unless there are other questions from the panel, I'm happy to rest on my submissions. Seeing none. Thank you, counsel. And Attorney Drattel, you have reserved one minute for rebuttal. Yes. Thank you, Your Honor. Thank you. So I want to say that the murder for Martinez would not have been admissible. The government is not correct. With respect to the government's argument for admissibility, that has something to do with the enterprise. It was dismissed because it didn't have to do with the enterprise. It was dismissed because, I'm sorry to interrupt, but it was dismissed, my understanding, because the government had not shown that his purpose in committing the murder was to further the enterprise. But it was the sequelae that embedded it and established its position in the enterprise. So it's not irrelevant. But what do I understand? Well, there are two. One is the threshold of relevance and then 403. But I'll leave 403 to what we argue in our papers, because it shouldn't have come in under 403 no matter what. But with respect to relevance itself, the predicate acts and the activity that constitutes the RICO has to be in furtherance of the enterprise. It has to be in, it has to be, you have to commit or agree to commit the predicate acts to conduct the affairs of the enterprise. This murder had nothing to do with conducting the affairs of the enterprise. It was not part of the enterprise. It should not have come in at all. And if it, even if it did come in, it wouldn't have come in this way. But I don't, I'm not saying it should have come in. What I'm saying is the inflammatory part of it just cannot be denied. The government's saying it's not more inflammatory. It's the only homicide within the time period of the indictment that he, that there's evidence against him of other than this conversation by someone working off 20 murders about something where he supposedly contributed money, no payments, no nothing, just an agreement. So that's that. On the Rule 33 issue, we do, at page 22 of our reply, we do cite the Jones case, which quotes Hamilton, which is subsequent developments create different contexts. So just in terms of the obligations for Rule 33, if there's a jury instruction that we think is inappropriate, we don't have to make a Rule 33 motion once we've objected to the instruction. If there's a jury note about something that we think gives us a basis for a new trial, we're not under an obligation to make that motion. The record for this court is the same as the record would be for the district court. Once Judge Furman granted the motion for acquittal, that's a new issue. But it's the same record. Retroactive misjoinder was a new issue. So you should have, shouldn't you have filed a motion to say, now, Judge, that you've come to this conclusion and are vacating the jury verdict. We want a new trial. Every misjoinder case that this court has, that's the reason why the government doesn't have a case, are all on appeal. Are you sure of that, counsel? Yes. Are you sure they weren't raised below? We could not find a case that says you have to do it below. Not that you have to do it below. There are others where it's not below. Your representation was that every case on retroactive misjoinder was only raised on appeal. Is that the claim you want to stand by? I'm sorry. Then I misspoke. Then I misspoke, Your Honor. What I meant is that there are no cases that say you have to, and there are plenty of cases where it's only raised on appeal. And it's just, even plain error, we make the plain error standard because this went directly to the heart of the case. They opened, they started their opening. They closed their opening. They started their summation. They closed their summation on this murder. And I will also say, with respect to Montague. Counsel, you're now at almost three minutes over your one-minute rebuttal. If you'll please wrap up. We do, I assure you, have your briefs.  And I would just say, page 24 of Montague, about the language applies precisely. The dissent to the denial of rehearing is precisely the same here, regardless of the distinctions in the statutes and the case law, which I acknowledge. Thank you, Your Honor. Thank you very much. Thank you to both counsel as well as attorney Padre Galarza for appearing remotely. We'll take the case under advisement.